Court No. 15-00240

**Slip Op. 20-1**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |
|---|---|
| **AMCOR FLEXIBLES SINGEN GMBH,**<br><br>　　　　　Plaintiff,<br><br>v.<br><br>**UNITED STATES,**<br><br>　　　　　Defendant. | **Before: Timothy M. Reif, Judge**<br><br>**Court No. 15-00240**<br>**PUBLIC VERSION** |

**OPINION**

[Granting Plaintiff's Rule 56 motion for summary judgment and denying Defendant's Rule 56 cross-motion for summary judgment.]

Dated: January 3, 2020

　　Wm. Randolph Rucker, Drinker Biddle & Reath LLP argued for Plaintiff Amcor Flexibles Singen Gmbh.

　　Jamie L. Shookman, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice and Aimee Lee, Senior Trial Counsel argued for Defendant United States. With them on the brief was Joseph H. Hunt, Assistant Attorney General and Amy M. Rubin, Assistant Director, International Trade Field Office. Of Counsel was Paula S. Smith, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

"Louis, I think this is the beginning of a beautiful friendship."[1]  When the

aluminum layer of Formpack Coldform Laminate ("Formpack") is merged with multiple

layers of plastic, the foil and plastics commence a symbiotic relationship that endures

far beyond the moment of importation.

At issue in this case is the tariff classification of this flexible packaging material

commercially known as Formpack.  Plaintiff Amcor Flexibles Singen Gmbh ("Amcor")

challenges a decision by United States Customs and Border Protection ("Defendant") to

classify Formpack under Heading 3921 in the Harmonized Tariff Schedule of the United

States (HTSUS), which covers plastics and carries a 4.2% *ad valorem* duty.  Plaintiff

argues that the product is correctly classified under Heading 7607, which covers

aluminum and is duty free, while Defendant seeks to sustain Customs' plastics

classification.  The question presented is whether Formpack is properly classified under

Heading 3921 of the HTSUS as plastic or under Heading 7607 as aluminum.

Plaintiff filed suit challenging the decision by Customs and Border Protection

denying Plaintiff's protests of Customs' classification under the HTSUS of Plaintiff's

packaging material.  The parties filed cross-motions for summary judgment addressing

the proper classification of the imported flexible packaging material.  *See* Pl.'s Mem. in

Supp. Of Pl. Mot. for Summ. J., ECF No. 50 ("Pl. Br."); Mem. in Opp. to Pl.'s Mot. For

Summ. J. and in Supp. of Def. Cross-Mot. for Summ. J., ECF No. 58 ("Def. Br."). *See*

Summons, ECF No. 1; Compl., ECF No. 15.  The court has subject matter jurisdiction

---

[1] CASABLANCA (Michael Curtiz/Hal Wallis Productions 1942).

pursuant to 28 U.S.C. 1581(a) (2012).  For the following reasons, the court determines

that Formpack is correctly classified under the aluminum heading.

## BACKGROUND

I.      The Imported Merchandise

From 2007 to 2014, the aluminum company Amcor imported 46 entries of the

subject merchandise into the United States through six different ports.  The Amcor

Flexibles division of the company manufactures seven different configurations of the

merchandise at its factory in Germany, Pl.'s Statement of Material Facts Not In Issue ¶

12, ECF No. 50 ("Pl. Stmt. Facts"); Def.'s Resp. to Pl.'s Statement of Material Facts Not

In Issue ¶ 12 (Def. Resp. Pl. Stmt.), and markets, advertises and sells Formpack as a

flexible packaging material that can be used to create an "aluminum blister pack."  Pl.

Stmt. Facts ¶ 24; Def. Resp. Pl. Stmt. ¶ 24.[2]  All seven configurations of the

merchandise are used to form the base material of cavities that are part of "blister

packs," which vary based on the needs of the customer.

Despite the differing variations of Formpack, all configurations share a common

structure consisting of multiple layers of plastics combined with a single layer of

aluminum foil sandwiched in between the plastic layers.  Pl. Ex. 1 at 3-4.  The basic

structure is: (1) a layer of oriented polyamide (oPA) film; (2) a layer of aluminum foil;

and (3) a plastic sealant layer, comprised of polypropylene (PP), polyvinyl chloride

---

[2] Another division of the company, Amcor Rigid Plastics, manufactures plastic
pharmaceutical packaging.  Pl. Stmt. Facts ¶ 14; Def. Resp. Pl. Stmt. ¶ 14.  None of the
merchandise at issue is manufactured by this division.

(PVC) or polyethylene (PE) plastic film.  *Id.*  Adhesives and primer facilitate merging the

different layers together.  Pl. Stmt. Facts ¶ 15; Def. Resp. Pl. Stmt. ¶ 15.  Amcor

manufactures the aluminum foil at a rolling mill, then laminates the aluminum and plastic

films together at a converting facility, creating Formpack.  Pl. Stmt. Facts ¶ 20; Def.

Resp. Pl. Stmt. ¶ 20.  At the time of importation, the Formpack arrives in a standard,

uniform condition: on rolls as a flat material in slit reel or coil form.  Pl. Stmt. Facts ¶ 23;

Def. Resp. Pl. Stmt. ¶ 23.

Each of Formpack's three layers imparts different properties.  One plastic layer,

oPA film, is puncture-resistant and elastic.  Def. Ex. 1 at 12; *see also* Pl. Ex. 8 at 10-12.

Its strength and elasticity aid in preventing the aluminum foil layer from cracking during

cold-forming, which is the process by which a customer creates cavities in Formpack by

stretching it into the desired shape.  Def. Ex. 1 at 12.  The middle layer, aluminum foil,

serves as the barrier layer.  The foil acts as a barrier to prevent moisture, light, oxygen

and other gases from penetrating the inside of the package.  Pl. Stmt. Facts ¶ 29; Def.

Resp. Pl. Stmt. ¶ 29.

The other plastic layer, composed of one of the three materials noted above,

provides an airtight closure for "sealing" when Formpack is heat-sealed to another

material (the lidding foil) as part of a package.  Pl. Ex. 1 at 7-8.  Some Formpack

models also contain an additional layer of plastic laminated to the standard three-layer

construction.  Pl. Stmt. Facts ¶ 19; Def. Resp. Pl. Stmt. ¶ 19.  The actual structure of

Formpack varies, depending on the weight and thickness of each layer in a particular

product as well as the number of layers of plastics.  Pl. Ex. 1 at 4.  Whether the

customer selects PP, PVC or PE plastic film as the sealant layer depends on which type of sealing layer the customer intends to use for the lid or what will be stored in the finished blister pack.  Pl. Stmt. Facts ¶ 56; Def. Resp. Pl. Stmt. ¶ 56.  All the layers are combined through an adhesive lamination process.  Pl. Stmt. Facts ¶ 15; Def. Resp. Pl. Stmt. ¶ 15.

After importation, customers use Formpack to create a finished blister pack, which consists of Formpack base material sealed with a lidding material.  Customers create blister cavities in Formpack through "cold-forming," whereby Formpack—aluminum foil and the plastic film layers—is molded into the desired shape.  This cold forming process contrasts with a heat-formed process, which is used to create blister cavities for a base material comprised solely of plastic.  Pl. Stmt. Facts ¶ 33; Def. Resp. Pl. Stmt. ¶ 33.

Cavities are formed in Formpack to conform to the shape of the contents of the package.  The "cold-forming" process, also known as "stretch-forming," Pl. Ex. 8 at 42:20-43:13, involves forming Formpack into its desired shape, similar to a stamping process.  *Id.* at 44:3-45:7.  The blister packs function as packaging containers for pharmaceutical products including tablets, caplets, gel-caps, powders, medical devices and diagnostics.[3]  The containers consist of both a base and lid material.  Pl. Ex. 1 at 3. The lid is heat-sealed together with the blister pack to enclose the contents within each

---

[3] Amcor manufacturers two types of blister packs: aluminum/aluminum and plastic/aluminum.  Pl. Stmt. Facts ¶ 26; Def. Resp. Pl. Stmt. ¶ 26.  Only the plastic/aluminum type is at issue in this case.

individual blister.  Pl. Ex. 1 at 6-8.  The lid material (which is not at issue in this case) is

comprised of an easily punctured material to facilitate accessing the package contents.


## STANDARD OF REVIEW & LEGAL FRAMEWORK

### I.      Standard of Review

Customs' protest decisions are reviewed *de novo* by the court.  28 U.S.C. §

2640(a)(1).  USCIT Rule 56 permits summary judgment when "there is no genuine

dispute as to any material fact…."  USCIT R. 56(a).  To raise a genuine issue of

material fact, a party cannot rest upon mere allegations or denials and must point to

sufficient supporting evidence for the claimed factual dispute to require resolution of the

differing version of the truth at trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248-49 (1986).  "[A]ll evidence must be viewed in the light most favorable to the

nonmoving party, and all reasonable factual inferences should be drawn in favor of the

nonmoving party."  *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed.

Cir. 1994) (citations omitted).  "A genuine factual dispute is one potentially affecting the

outcome under the governing law."  *Anderson*, 477 U.S. at 248.

The court reviews classification cases on "the basis of the record made before

the court."  28 U.S.C. § 2640(a).  The court has "an independent responsibility to decide

the legal issue of the proper meaning and scope of HTSUS terms."  *Warner-Lambert

Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citing *Rocknel Fastener,

Inc. v. United States*, 267 F.3d 1354, 1358 (Fed. Cir. 2001)).  Customs is afforded a

statutory presumption of correctness in classifying merchandise under the HTSUS.  *See*

28 U.S.C. § 2639(a)(1).  Plaintiff bears the burden to show that the government's

classification is incorrect.  *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed.

Cir. 1984).  If that burden is met, the court then has the responsibility to determine the

correct classification.  *Id*.

   "The ultimate question in a classification case is whether the merchandise is

properly classified under one or another classification heading," which is "a question of

law."  *Bausch & Lomb v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998).  The

determination of whether an imported item has been properly classified involves a two-

step analysis.  *Sports Graphics, Inc. v. United States*, 24 F.3d 1390, 1391 (Fed. Cir.

1994); *see also Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006).

First, the court must construe the proper meaning of specific terms of the tariff provision.

*See Universal Elecs. Inc. v. United States*, 112 F.3d 488, 491 (Fed. Cir. 1997).  Second,

the court must determine whether the merchandise at issue comes within the

description of such terms as properly construed.  *Id*.  The first step is a question of law,

while the second is one of fact.  *Pillowtex Corp. v. United States*, 171 F.3d 1370, 1373

(Fed. Cir. 1999).  When the parties do not dispute any facts regarding the merchandise,

then resolution of the classification depends solely on the first step.  *Cummins Inc.*, 454

F.3d at 1363.

   Every new entry of goods into the United States constitutes a new cause of

action because every classification involves both the interpretation of the relevant

statute as well as questions of fact regarding the merchandise.  *Stare decisis* binds the

court to prior legal determinations and bars the relitigation of issues decided in those

actions.  *United States v. Mercantil Distribuidora, S.A.*, 45 CCPA 20, 23-24 (1957).

However, "circumstances justify limiting the finality of the conclusion in customs

controversies to the *identical* importation."  *United States v. Stone & Downer Co.*, 274

U.S. 225, 236 (1927) (emphasis supplied).  Since *stare decisis* "deals only with law,"

*Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1570 (Fed. Cir. 1993), judicial precedent

holds weight only with respect to the legal construction of specific terms or provisions,

not questions of fact.  *Id.*

## II.    Legal Framework

The General Rules of Interpretation ("GRIs") of the HTSUS govern the proper

classification of merchandise entering the United States.  The GRIs "are applied in

numerical order."  *ABB, Inc. v. United States*, 421 F.3d 1274, 1276 n. 4 (Fed. Cir. 2005).

"The HTSUS is designed so that most classification questions can be answered by GRI

1."  *Telebrands Corp. v. United States*, 37 CIT ___, ___, 865 F. Supp. 2d 1277, 1280

(2012), *aff'd* 522 Fed. Appx. 915 (Fed. Cir. 2013).  The GRIs consist of six rules, but "if

an earlier rule resolves the classification question, the court does not look to

subsequent rules."  *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed.

Cir. 2011).  According to GRI 1, "classification shall be determined according to the

terms of the headings and any relative section or chapter notes."  GRI 1.  Therefore, "a

court first construes the language of the heading, and any section or chapter notes in

question."  *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998).

HTSUS terms are construed according to their common commercial meanings.

*Len–Ron Mfg. Co. v. United States*, 334 F.3d 1304, 1309 (Fed. Cir. 2003).  A court may

rely on its own understanding of terms as well as secondary sources such as

lexicographic and scientific authorities, dictionaries and other reliable information to

construe a given term.  *N. Am. Processing Co. v. United States*, 236 F.3d 695, 698

(2001).  For additional direction on the scope and meaning of tariff headings and

chapter and section notes, the court may also consult the Explanatory Notes to the

Harmonized Commodity Description and Coding System, developed by the World

Customs Organization (WCO).

Explanatory Notes are "generally indicative of the proper interpretation of a tariff

provision."  *Agfa Corp. v. United States*, 520 F.3d 1326, 1239 (Fed. Cir. 2008) (citation

omitted).  "Unlike Chapter Notes, Explanatory Notes are not legally binding."  *Deckers*

*Outdoor Corp. v. United States*, 714 F.3d 1363, 1367 n. 1 (Fed. Cir. 2013).  However,

"the Explanatory Notes are persuasive authority for the court when they specifically

include or exclude an item from a tariff heading."  *H.I.M./Fathom Inc. v. United States*,

21 CIT 776, 779, 981 F. Supp. 610, 613 (1997); *see also BASF Corp. v. United States*,

30 CIT 227, 232 F. Supp. 2d 1200, 1205 n.6 (2006), *aff'd*, 497 F.3d 1309 (Fed. Cir.

2007).


**DISCUSSION**

I.        Positions of the Parties

Pursuant to GRI 1, Plaintiff seeks classification of the subject merchandise under

Heading 7607, which covers aluminum.  Pl. Br. at 2.  Specifically, Plaintiff contends that

the merchandise is classifiable under Heading 7607.20.50, which provides as follows:

| 7607 | Aluminum foil (whether or not printed, or backed with paper, paperboard, plastics or similar backing materials) of a thickness (excluding any backing) not exceeding 0.2 mm: |
| --- | --- |
| 7607.20 | Backed: |
| 7607.20.50 | Other: Flexible…………………………………free |

Plaintiff contends that Heading 7607 provides specifically for aluminum foil "backed" with a "backing" material and that when the terms "backed" and "backing" are properly construed, the subject merchandise is properly classified as "backed foil" under subheading 7607.20.50.  Plaintiff argues that Formpack is not properly classified as plastic because Formpack would have to "assume the character" of plastic in order to shift the classification out of Heading 7607, and here it does not.  According to Plaintiff, Formpack retains the character of "backed," laminated aluminum foil, Pl. Br. at 36, and the plastic film layers are merely support materials that do not define the character of the good.  Plaintiff argues that, according to GRI 1, Formpack is correctly classified as aluminum under Heading 7607, and not as plastic under Heading 3921.

Defendant, however, maintains that Formpack is properly classified under Heading 3921 as "[o]ther plates, sheets, film, foil and strip, of plastics."  Def. Br. at 16.  Defendant contends that the materials are properly classified as plastic film under subheading 3921.90.40.  Def. Br. at 12-13.  The relevant subheading provides as follows:

| 3921 | Other plates, sheets, film, foil and strip, of plastics: |
| --- | --- |
| 3921.90 | Other: |
| 3921.90.40 | Other: Flexible………………………4.2% |

Defendant relies on the decision of the U.S. Court of Appeals for the Federal Circuit ("CAFC") in *Alcan Food Packaging (Shelbyville) v. United States*.  771 F.3d 1364 (Fed. Cir. 2014).  In that case, the CAFC considered the classification of Flexalcon—a different good, though one consisting also of plastic and aluminum layers laminated together—and determined that the good satisfied the definition of "plastic film" under Heading 3921.  771 F.3d 1364 (Fed. Cir. 2014).

*Alcan* considered the importation of Flexalcon, a flexible food packaging material. Formpack consists of different components, in different quantities and in a different configuration, and Formpack performs a different function than Flexalcon.  In *Alcan*, this court found that Flexalcon has "so many layers other than the foil layer" and "so many properties beyond that of aluminum foil" that the subject merchandise was properly classified under Heading 3921. *Alcan*, 929 F. Supp at 1351-1352, *aff'd*, *Alcan*, 771. F.3d 1364.  Because the plastic layers "define Flexalcon as a flexible food packaging solution for the military," the court found that Flexalcon "retains the essential character of plastic and does not assume the character of aluminum foil."  *Id.* at 1352, and the CAFC affirmed this judgment.  *Alcan*, 771 F.3d 1364.

Defendant argues that, because the same two tariff provisions were considered in *Alcan* and the court determined that Heading 3921 covered the merchandise at issue, that, therefore, the classification analysis in this case properly begins under Heading 3921.  Defendant argues further that Formpack's plastic layers "dominate" with respect to quantitative factors as well as in relation to the product's use, Def. Br. 24-26, and that the plastic layers are indispensable to the product's use as pharmaceutical packaging.

*Id.* at 30.  According to Defendant, because Formpack "assumes the character" of

plastics, Note 1(d) of Chapter 76 grants priority to Chapter 39.

II.      Competing Tariff Provisions

Heading 3921: Plastic Film

Heading 3921 covers "Other plates, sheets, film, foil and strip, of plastics."

According to the HTSUS, plastics are "those materials of Headings 3901 to 3914 which

are or have been capable, either at the moment of polymerization or at some

subsequent stage, of being formed under external influence (usually heat and pressure,

if necessary with a solvent or plasticizer) by molding, casting, extruding, rolling or other

process into shapes which are retained on the removal of the external influence."  Note

1 to Chapter 39.  The HTSUS does not define "plastic film," but the court has stated that

plastic film is "made from polyvinyl chloride, polyethylene, polypropylene, polystyrene,

Mylar, and other resins; used for wrapping, sealing, garment waterproofing, and coating

wood, paper, or fabric."  *Alcan*, 929 F. Supp. 2d at 1344 (citing McGraw Hill Dictionary

of Scientific and Technical Terms at 1613 (2003), *aff'd, Alcan*, 771 F.3d 1364 (Fed. Cir.

2014).

By its own language, Heading 3921 covers merely plastics, without mention of

any other material.  To interpret Heading 3921 to encompass a combination material

consisting of plastic and aluminum specifically, it is necessary to construe Heading 3921

in conjunction with Heading 3920.  Reading the provisions together supports the

conclusion that Heading 3921 covers aluminum foil laminated with plastic.  That is

because while Heading 3920 covers plastics "*not* reinforced, laminated, supported or

similarly combined with other materials," Heading 3921 is intended to cover "'*other'*

plastic goods excluded from 3920," *e.g.*, plastics laminated with aluminum foil

(emphasis supplied).

The Explanatory Notes to Chapter 39 further elucidate Heading 3921's scope

through addressing the classification of plastics combined with other materials.[4]  The

Explanatory Notes state:

> This Chapter also covers the following products, whether they have been
> obtained by a single operation or by a number of successive operations *provided*
> that they retain the essential character of articles of plastics:
> ….
> (b) Plates, sheets, etc., of plastics, separated by a layer of another material such
> as metal foil, paper, paperboard."

General Explanatory Notes to Chapter 39 (emphasis in original).  The Explanatory

Notes to Chapter 39, read together with the text of Heading 3920, therefore suggest that

Heading 3921 is intended to cover plastics merged with other materials, but also that an

analysis of the combined material is necessary to determine whether plastic or the other

material constitutes the "essential character" of the article.  The Explanatory Notes to

Heading 3921 further clarify:

> This heading covers plates, sheets, film, foil and strip, of plastics, other than
> those of heading *39.18*, *39.19* or *39.20* or of *Chapter 54*.  It therefore covers only
> cellular products or those which have been reinforced, laminated, supported or
> similarly combined with other materials.

---

[4] Citations of the Explanatory Notes in this Opinion are to the 5th edition.  *See* World
Customs Org., Harmonized Commodity Description and Coding System.

(emphasis in original).  It follows logically, then, that plastic film combined with other

materials may in some cases fall under Heading 3921 depending on the composition of

the material, due to the effect of the Explanatory Notes.

Heading 7607: Aluminum

Heading 7607 applies to "Aluminum foil (whether or not printed, or backed with

paper, paperboard, plastics or similar backing materials) of a thickness (excluding any

backing) not exceeding 0.2 mm," thus covering combination materials such as

multilayer laminate packing materials.  The HTSUS defines neither "aluminum" nor

"aluminum foil," but the court has defined "aluminum" as a "bluish-white metal

characterized by its lightness" and "aluminum foil" as a "thin, aluminum sheet, widely

used as a food wrapping, cooking sheet, and insulation backing."  *Alcan*, 929 F. Supp.

2d at 1346 (citing Academic Press of Science and Technology at 87 (1992), *aff'd*, *Alcan*,

771 F.3d 1364.

The terms "backed" and "backing" are not defined in the HTSUS and have also

not been defined by the courts.  The most common meaning of "backing" varies by

dictionary.  The most common meaning according to both the *Random House*

*Dictionary of the English Language* ("*Random House Dictionary*") ("aid or support of any

kind," *Random House Dictionary* (2nd ed. Unabridged, 1987, at 151)) and Oxford English

Dictionaries ("help or support," Backing, Oxford English Dictionaries, *available* at

https://en.oxforddictionaries.com/definition/backing), emphasizes the general concept of

support, while the most common meaning in the Merriam-Webster Dictionary

accentuates a positional reference ("something forming a back," Backing, Merriam-

Webster Dictionary, *available* at https://www.merriam-webster.com/dictionary/backing).

The most common meaning of "backed" reflects a similar emphasis: according to

Oxford English Dictionaries, "backed" is to "give financial, material or moral support to,"

(Backing, Oxford English Dictionaries, *available* at

https://en.oxforddictionaries.com/definition/backing), while in the *Random House*

*Dictionary* the most common meaning is "having a back, backing, setting, or support

(often used in combination)."  *Random House Dictionary* at 151.[5]  Ordinary dictionaries

thus show that while "backed" and "backing" may be construed either to emphasize the

idea of support or aid or to have a positional reference, the former is the more common

meaning.  As discussed in more detail below, in the context of Heading 7607, "backed"

is most appropriately construed to mean "supporting."

     Heading 7607 permits several types of processes to come within the scope of the

heading.  "Products and articles of aluminum are frequently subjected to various

treatments to improve the properties or appearance of the metal, to protect it from

corrosion, etc."  General Explanatory Notes to Chapter 76.  These treatments do not

affect the classification of the aluminum goods, and the Explanatory Notes specifically

identify "lamination" as coming within the list of treatments that do not affect the heading

in which flat-surfaced aluminum goods are classified.  General Explanatory Notes to

Chapter 72.

     In construing Heading 7607, Note 1(d) to Chapter 76 must also be followed.  The

Note provides that:

---

[5] Merriam-Webster Dictionary does not contain a separate definition for "backed."

> Headings 7606 and 7607 apply, inter alia, to plates, sheets, strips and foil with patterns (for example, grooves, ribs, checkers, tears, buttons, lozenges) and to such products which have been perforated, corrugated, polished or coated, provided that they do not thereby *assume the character* of articles or products of other headings.

(Emphasis supplied.)  This provision indicates that certain articles, which could conceivably fit under Headings 7606 or 7607, are properly classified under a different heading if those articles are further processed.

### III.   Classification of the Product at Issue

The court's inquiry begins with an assessment of whether any chapter contains a heading that describes the merchandise in question.  No tariff provision specifically enumerates the term "flexible packaging materials," but both plastic and aluminum constitute their own chapters of the HTSUS.  Headings under both Chapters 39 and 76 plausibly could cover the good in question.  Heading 7607 by its terms directly covers aluminum foil laminated with plastic, without the need to reference any other tariff provision or note.  The provision covers "Aluminum foil (whether or not printed, or backed with paper, paperboard, plastics or similar backing materials) of a thickness (excluding any backing) not exceeding 0.2 mm."[6]  Heading 3921 can also be read to encompass a plastic combined with another material.  However, to read Heading 3921 to encompass plastic sheets separated by a layer of aluminum foil, it is necessary to interpret Heading 3921 in conjunction with Heading 3920.  As noted, GRI 1 dictates that "classification shall be determined according to the terms of the headings and any relative section or chapter notes."  GRI 1.  Since Heading 7607 directly covers the

---

[6] The parties do not dispute that all the layers of Formpack do not exceed 0.2 mm.

merchandise with specificity and without requiring reference beyond the four corners of the tariff provision itself, unlike Heading 3921, the court begins its analysis under Chapter 76.

Whether Chapter 76 covers the merchandise at issue depends on whether Formpack is "aluminum . . . backed with . . . plastics."  Heading 7607.  Defendant urges an interpretation of "backing" according to which the plastic layers of Formpack do not qualify as "backing."  Under Defendant's reading, "backed" foil refers to a product in which the plastics are located on only a single side of the foil, *i.e.*, the "back."  Def Br. at 35.  One definition of "backed" in the *Random House Dictionary* is "having a back, setting, or support," and the same dictionary defines "backing" as "that which forms the back or is placed at or attached to the back of anything to support, strengthen, or protect it."  However, aluminum has no "back" side; its two sides are essentially identical.

"Where a tariff term has various definitions or meanings and has broad and narrow interpretations, the court must determine which definition best expresses the congressional intent."  *Quaker Pet Group, LLC v. United States*, 42 CIT ___, ___, 287 F. Supp. 3d. 1348, 1355 (2018).  Imposing a positional reference on "backed" aluminum would render the entire concept of "backed" aluminum a nullity because without a "back," aluminum could never be "backed."  To do so would contravene the interpretive canon against surplusage—the idea that all provisions should be given effect and none should be given an interpretation to have no consequence.  *Nielson v. Preap*, 139 S.Ct.

954, 955 (2019).  To interpret "backed" in the context of Heading 7607 as a positional reference would thus contravene core rules of statutory construction and defy logic.

Moreover, the word "back" does not appear in the language of the heading.  Had the congressional intent been for "backed" foil to refer only to aluminum foil with a backing on the "back" side, the language could have reflected this preference.  The use of "backed" instead in this context suggests an intent not to impose a positional reference but to refer to material that supports the aluminum foil.  It is common sense that aluminum foil may be thin or flimsy, therefore requiring support.  Especially because aluminum foil contains no back side, applying "backed" as "supported," and "backing" as "supporting," appears to effectuate the language of Heading 7607 best in this context.

The purpose of a "backing" material, based on the Explanatory Notes to Chapter 74, further substantiates this reading.  The Explanatory Notes to Chapter 74, which apply, *mutatis mutandis*, to Heading 7607, do not define the terms "backed" and "backing," but they provide guidance on the purpose of a backing material.  The Explanatory Notes to Heading 7410 state that foil is "often backed with paper, paperboard, plastics or similar backing materials, either for convenience of handling or transport, or in order to facilitate subsequent treatment, etc."  The Explanatory Notes thus demonstrate the function that a backing material provides for backed foil and they clearly suggest a support role for the backing material.

This elucidation of "backing" is consistent also with how the WCO has interpreted this language in the context of Heading 7607.  WCO Harmonized System Committee

("HSC") Document NC19831E1a.  The WCO has stated that the "backing" is intended to "serve solely to make up for the flimsiness of the foil, which could not otherwise withstand the handling necessary for transport and subsequent treatment".  *Id.*  A "WCO classification may be consulted for "persuasive value," *Cummins Inc.*, 454 F.3d at 1366, and may be entitled to "respectful consideration."  *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 354 (2006).  In sum, the dictionary definition, Explanatory Notes and WCO's interpretation all support interpreting "backing" as "supporting."

The relationship between the aluminum foil layer of Formpack and the oPA plastic layer demonstrates that the plastic layer plays the supporting role that would be expected from a "backing" material.  Aluminum foil provides the impermeable barrier component to Formpack.  Pl. Stmt. Facts ¶ 29; Def. Resp. Pl. Stmt. ¶ 29.  This barrier trait is the primary consideration for a customer selecting blister pack material.  Pl. Stmt. Facts ¶ 42; Def. Resp. Pl. Stmt. ¶ 42.  The oPA layer enhances the formability of the merchandise, Def. Resp. Pl. Stmt. ¶ 34, and helps prevent the foil from breaking or fracturing during cold-forming.  Pl. Stmt. Facts ¶ 53; Def. Resp. Pl. Stmt. ¶ 53.  *See* Def. Resp. Pl. Stmt. ¶ 35 ("the fact that the plastic layers are not permanently deformed by the cold-forming process gives these layers 'spring back strength' that helps strengthen and stabilize the aluminum foil").  *See also* Recording of Oral Argument at 0:56:50 – 0:58:151 (According to Defendant's counsel, "Plastic's tendency to spring back . . . that property strengthens and stabilizes the foil, and . . . adds value to the product . . . The plastic is there to support [the foil] . . . without that plastic . . . the foil could not be

formed into as deep or sharp a cavity.").  The role of the oPA plastic layer aligns with

the expected function of a backing material—to provide support.

In the alternative, "backing" could be interpreted to mean "on *only one* side."

Since *either* side may conceivably be considered to be the "back," the language of the

HTSUS, dictionary definitions and other guidance noted above do not limit "backed" or

"backing" such that that only Side A of the item may have a material affixed to it, while

Side B may not.

To the contrary, neither the HTSUS nor other authorities cited limit the placement

of materials to only a single side of the material being backed, and no other limitation

precludes specifically a foil laminated with materials on both sides from being classified

as aluminum foil.  *See, e.g.*, NYRL F84357 (March 27, 2000) *available* at

https://rulings.cbp.gov/ruling/F84357 (classifying aluminum foil with plastic film on one

side and a heat sealant on the other under Heading 7607).  To determine that

Formpack does not qualify as backed foil because of the presence of a sealant material

on "Side B" of the foil would be to read into the language of the statute a requirement

that does not appear there: that the side of the foil without the "backing" may not have

anything affixed or attached to it.  Moreover, as Defendant's counsel acknowledges,

"Whether there are materials on both sides as opposed to films on both sides . . . the

answer to both is that yes, such a product could theoretically be classified in Heading

7607."  Recording of Oral Argument at 1:17:00-1:17:18.  In this way, Formpack may

properly be considered "backed" irrespective of which definition of "backed" is applied.

This classification under Heading 7607 is proper because Formpack does not

"assume the character" of plastic, thus not activating the rule in Note 1(d) to Chapter 76

that would otherwise shift the classification to another chapter.  According to Note 1(d),

Heading 7607 applies "to plates, sheets, strip and foil . . . which have been perforated,

corrugated, polished or coated, provided that they do not thereby assume the character

of articles or products of other headings."  The *Alcan* court described Note 1(d) as a

"priority rule, giving priority to another heading that covers the composite product."  929

F. Supp. 2d at 1368, *aff'd*, *Alcan*, 771 F.3d at 1364.  For the rule to apply, the court

must determine that Formpack "assumes the character" of another article—here,

plastic.

Neither Heading 7607, Note 1(d), nor *Alcan* provides insight into the meaning of

"assume the character" in the context of Chapter 76.  However, the court finds guidance

in the interpretation of identical language in a chapter note to Chapter 72 of the HTSUS.

That note to Chapter 72, which contains the identical proviso of the note to Chapter 76,

was considered in *Motor Wheel Corp. v. United States*, 19 CIT 385 (1995).

In *Motor Wheel*, the court was presented with the question of whether stamped

articles of steel should be classified as flat-rolled products or "advanced steel products."

*Id.* at 388 (emphasis in original).  The court described its inquiry in that case as

"whether the process of stamping sufficiently advances the flat-rolled steel such that the

resulting blank (or stamped article) is so distinct from the flat-rolled steel coil input from

which it was produced that it can no longer be described by the common meaning of the

term 'flat-rolled steel' but instead assumes the character of a different article under the

tariff schedule." *Id.* at 388.  Under this approach, for Formpack to "assume the character" of plastic, the process of backing aluminum foil would have to alter the product so significantly that the plastic layers subsume the foil—to the point where the good could no longer be described as foil.

The record before the court does not support the conclusion that the foil "assume[s] the character" of plastic once the layers are merged together.  The primary characteristic that the aluminum layer provides for the good is to serve as an absolute barrier to moisture, light, oxygen, other gases, and bacteria.  Pl. Stmt. Facts ¶ 29; Def. Resp. Pl. Stmt. ¶ 29.  Once the plastic layers are merged with the aluminum, the aluminum foil still provides the impermeable barrier that remains the critical component of Formpack.  Formpack undoubtedly *gains* properties of plastic as the aluminum foil is laminated with the plastic layers.  However, Formpack is not "so distinct" from the aluminum foil layer as it exists prior to its merger with the plastic layers that it can no longer be described by the common meaning of the term "aluminum foil."

The processing of the foil changes the character of the material by imparting additional properties, but the characteristics of Formpack after the foil is combined with plastics do not mark a transformation in the character of the foil such that it no longer may be considered foil: to the contrary, Formpack retains its aluminum characteristics. In the formulation of the *Motor Wheel* court, the merging of plastic with the aluminum does not advance Formpack beyond the scope of the aluminum tariff provision.  To take on characteristics of plastic film is not to "assume the character" of plastic that would activate the rule in Note 1(d) to Chapter 76.  Formpack is *prima facie* classifiable under

Heading 7607 and it is not excluded by Note 1(d), because the character of the plastic

does not subsume that of the aluminum.

However, the inquiry does not end there because the court has an independent

obligation to determine the correct classification.  *Jarvis Clark*, 733 F.2d at 878.  To that

end, the court examines the possibility of whether Formpack properly falls under any

other heading of the HTSUS.   Accordingly, the analysis shifts to Heading 3921 to

determine whether Formpack properly falls under a second heading.

Heading 3921 covers "Other plates, sheets, film, foil and strip, of plastics."  Read

alone, Heading 3921 does not directly name and include, and does not appear to cover,

multilayer laminate packaging materials.  The plain language of the heading by itself

mentions only plastic, not aluminum.  However, when Heading 3921 is read together

with an adjacent heading (Heading 3920), Heading 3921 may then be read to include

multilayer laminate packaging materials, including materials that are not plastics.  While

Heading 3920 covers "[o]ther plates, sheets, film, foil and strip, of plastics, non-cellular

and *not reinforced, laminated, supported or similarly combined with other materials*,"

(emphasis supplied), Heading 3921 covers "*Other* plates, sheets, film, foil and strip, of

plastics" (emphasis supplied).  The canon of statutory construction *in pari materia*

("upon the same matter or subject") instructs to read the headings together, providing

the basis to elucidate the meaning of the term "other."  Reading the two headings

together allows for interpreting "other" in Heading 3921 as covering goods excluded

from Heading 3920, namely, "plastic goods that either are cellular or are 'reinforced,

laminated, supported or similarly combined with other materials.'"  *Alcan*, 771 F. Supp.

2d at 1367.

Strictly by its own terms, then, Heading 3921 does not appear to cover a plastic-

aluminum combination article such as Formpack.  However, considering the language

of Heading 3921 in relation to Heading 3920 and in light of the Explanatory Notes to

Chapter 39, conceivably brings an article such as Formpack within the tariff provision.

First, as defined by Note 1 to Chapter 39,[7] the oPA, PVC, PE and PP components of

Formpack all constitute "plastic."  Second, these layers all constitute "sheets" or "films"

of plastic.  *See* Pl. Stmt. Facts ¶ 3; Def. Resp. Pl. Stmt. ¶ 3 (describing oPA, PVC, PP

and PP as "films").  And, third, the sheets or films of plastic are "separated by a layer of

another material such as metal foil."  Explanatory Notes to Heading 3921.

However, the Explanatory Notes to Chapter 39 state that the chapter covers

plastics separated by a layer of another material such as metal foil only as long as they

"retain the essential character of articles of plastics."  *See* Explanatory Notes to Heading

3921; *see also*, *Alcan*, 771 F.3d at 1367.  Therefore, if the language of the Explanatory

Notes suggests that Formpack does not properly belong under Heading 3921, then that

language together with the analysis above would indicate that Chapter 39 does not

cover Formpack.  The inquiry thus shifts to the Explanatory Notes.

---

[7] Note 1 to Chapter 39 provides: "Throughout the tariff schedule the expression
'*plastics*' means those materials of headings 3901 to 3914 which are or have been
capable, either at the moment of polymerization or at some subsequent stage, of being
formed under external influence (usually heat and pressure, if necessary with a solvent
or plasticizer) by molding, casting, extruding, rolling or other process into shapes which
are retained on the removal of the external influence."

The language of the Explanatory Notes suggests an essential character analysis to determine the scope of Heading 3921.  The court assesses the product's character based on the condition of the product at the time of importation.  *Gen Elec. Co.-Med. Sys. Grp. v. United States*, 247 F.3d 1231, 1235 (Fed. Cir.), *opinion amended on' reh'g*, 273 F.3d 1070 (Fed. Cir. 2001).  The GRIs do not define "essential character" but the Explanatory Notes to GRI 3(b) provide guidance to make this determination.  *See* General Explanatory Notes to Chapter 39.  Because "essential character" typically arises in the context of GRI 3(b), the court looks to the interpretation of this language within that context to elucidate its meaning here.

To be clear, the court looks to the guidance from the analytical framework provided by GRI 3(b) and decisions of the Federal Circuit and this court applying GRI 3(b) to elucidate the "essential character" language of the pertinent EN to Chapter 39, and not to suggest that the court believes an analysis under GRI 3(b) is appropriate to this case.  To the contrary, the court's analysis of the potential applicability of Heading 3921 continues to proceed under GRI 1.

"The essential character inquiry is factual in nature . . . [and] involves weighing a number of diverse factors."  *Structural Indus., Inc. v. United States*, 356 F.3d 1366, 1370 (Fed. Cir. 2004).  The "factor which determines essential character will vary as between different kinds of goods" and "may, for example, be determined by the nature of the material or component, its bulk, quantity, weight or value, or by the role of a constituent material in relation to the use of the goods."  Explanatory Notes to GRI 3(b). *See also Alcan*, 929 F. Supp. 2d at 1348 (quoting Explanatory Notes to GRI 3(b)), *aff'd*,

*Alcan*, 771 F.3d at 1364.  No single, objective factor determines essential character.

The "primary function" of an article may also be the basis for a determination of

essential character.  *3G Mermet Fabric Corp. v. United States*, 25 CIT 174, 181, 135 F.

Supp. 2d 151, 159 (2001).  The CAFC has found "no error" when this court has

"carefully considered all of the facts" and conducted a "reasoned balancing of all the

facts" to determine essential character.  *Better Home Plastics Corp. v. United States*,

119 F.3d 969, 971 (Fed. Cir. 1997).

 "Essential character conclusions may well differ from imported product to

imported product, and prior rulings with respect to similar but non-identical items are

also of little value in assessing the correctness of the classification of a similar but not

identical item."  *Structural Indus., Inc.*, 356 F.3d at 1371.  Thus, the determination of

Formpack's essential character is made solely on the basis of Formpack's character

and unrelated to the essential character of any other, similar article.  The "essential

character" of an article is "that which is indispensable to the structure, core or condition

of the article, i.e., what it is."  *Home Depot USA, Inc. v. United States*, 30 CIT 445, 460,

427 F. Supp. 2d 1278, 1293 (2006), *aff'd*, 491 F.3d 1334 (Fed. Cir. 2007) (citing *A.N.

Deringer, Inc. v. United States*, 66 Cust. Ct. 378, 383 (1971)).

 The court's "essential character" inquiry begins with a quantitative comparison of

the plastic and aluminum in Formpack.  Presuming that Formpack's plastic layers are

aggregated for purposes of this comparison, neither the plastic layers nor the aluminum

layer predominates.  The parties do not dispute that Formpack consists of aluminum

foil, combined with plastic film layers using an adhesive lamination process, Pl. Stmt.

Facts ¶ 15; Def. Resp. Pl. Stmt. ¶ 15, with minor variance in the proportion of plastic to

aluminum depending on the configuration.  Pl. Stmt. Facts ¶ 3; Def. Resp. Pl. Stmt. ¶ 3.

However, Plaintiff and Defendant employ different formulas to determine the relative

share of thickness, value and weight of the plastic as aggregated compared to the

aluminum.  *See* Pl. Ex. 1 at 5-6.  Def. Ex. at 1.  In particular, some of Defendant's

quantitative measurements include adhesive and primer as coming within the share of

the material considered to be plastics.[8]  This approach stands in contrast to the

approach used by this court and in *Alcan*.  929 F. Supp. 2d 1338, *aff'd, Alcan*, 771 F.3d

1364.

   Nevertheless, even under Defendant's methodology, plastics comprise a greater

share of Formpack's thickness and value, while aluminum outweighs plastic by weight

for six out seven models.  Among the seven types of Formpack at issue, plastic layers

comprise between [[          ]] of the product's thickness, or an average of [[    ]] and

between [[      ]] of its value, or an average of [[    ]].  Def. Ex. 1 at 11.[9]  Aluminum

represents a greater share of the weight for six of the seven models, comprising

between [[      ]] of the total weight, or an average of [[    ]].  *Id.*

---

[8] The Defendant includes adhesive and primer in calculating the weight of the plastic
relative to aluminum.  Pl. Ex. 1 at 5-6.  The precise formula used by the Defendant for
other measures is unclear.  *Id.*

[9] Since aluminum foil serves as an absolute barrier regardless of thickness, Pl. Stmt.
Facts ¶ 66; Def. Resp. Pl. Stmt. ¶ 66, a thicker aluminum foil layer would increase the
cost of Formpack without enhancing its functionality.  Since increased thickness does
not correlate with increased functionality, the utility of thickness as a barometer of
essential character is considerably less persuasive.

Which factors are most important for determining essential character will vary for different types of goods.  *See Structural Indus.*, 356 F.3d at 1370.  However, when one component material does not *clearly predominate* over another, quantitative differences alone may not form the basis for a determination of essential character. *See, e.g.*, *Swimways Corp. v. United States*, 42 CIT ___, ___, 329 F. Supp. 3d 1313, 1322 (2018) (emphasis supplied) (finding, in a quantitative comparison, that "both the textile materials and the plastic materials [were] present in significant, but not clearly predominant, proportions" so a quantitative comparison was not persuasive).  In sharp contrast to *Alcan*, where the court found that "plastic predominates in Flexalcon according to traditional measures like bulk, quantity, weight, and value," 771 F.3d at 1367, the uncontested facts in this case do not support a conclusion that any single class of materials predominates in Formpack by all quantitative measures.  Whereas in *Alcan* every quantitative measure favored plastic [[                    ]], here both aluminum and plastic are "present in significant, but not clearly predominant, proportions," *Swimways Corp.*, 329 F. Supp. 3d at 1322.  Aluminum outweighs the plastic by weight, plastic prevails with respect to value and for the reasons noted, the court determines that thickness in this case does not weigh in favor of either material.  Accordingly, the court determines that Formpack's quantitative traits do not weigh in favor of either aluminum or plastics as the product's "essential character."

When assessing a product's essential character, the court also considers the "role of a constituent material in relation to the use of the goods."  Explanatory Notes to GRI 3(b).  The principal use of Formpack is to serve as the base material for blister

packs containing pharmaceutical products.  Central to its ability to function as a

container is the ability to protect and preserve the contents, and the aluminum foil is the

sole layer in Formpack critical to serving as a barrier: aluminum provides an

"impermeable barrier to moisture, light, oxygen, and other gases [sic]."  Pl. Stmt. Facts ¶

29; Def. Resp. Pl. Stmt. ¶ 29.  Comprised solely of plastics, a base material cannot

achieve the same level of barrier as a base material that contains a layer of aluminum.

Pl. Stmt. Facts ¶ 32; Def. Resp. Pl. Stmt. ¶ 32.  Amcor's all-plastic base materials have

a "very high moisture barrier, *but they are nowhere near foil*."  Pl. Ex. 8, Wittemer Dep.

at 47-48 (emphasis supplied).

   While plastic helps to render the shape of Formpack and provides sealability,

aluminum is the indispensable component for the "contain" function because of the

barrier property it imparts.  The majority of Plaintiff's customers are healthcare or

pharmaceutical companies, Pl. Br. at 12, so providing an effective barrier against

moisture is of particular importance.  Blocking moisture allows the package to maintain

the effectiveness of the product and prolongs its shelf-life.  Plastics also contribute to

Formpack's barrier function, but in a supporting capacity: both the sealant and oPA

plastic layers help to prevent the aluminum from fracturing and plastic provides strength

that prevents the collapse of the blister shape.  Def. Ex. 1 at 16.  In sum, the plastic

layers facilitate and enable the aluminum layer to provide the indispensable barrier

property.

   Still, the plastic layers impart multiple, independent functions to Formpack, which

are also critical, albeit secondary, functions relative to the properties imparted by the

foil.  Plastics are critical to impart the ability to transport a good: the plastic layers

enable Formpack to endure the process of storage and distribution. *See* Pl. Ex. 1 at 7-8.

Plastic is also critical to inform the customer of what the blister pack contains: drug

information may be printed on Formpack's outer layer of oPA film, *see* Def. Ex. 1 at 12,

but it may not be printed on the foil layer.  Transporting the good and informing the

customer are both secondary to Formpack's principal function as a packaging material

that acts as a barrier to protect the blister pack's contents.

  While both plastic and aluminum impart critical functions to Formpack, it is the

aluminum that provides to Formpack the barrier property to serve effectively as a

container for pharmaceuticals.  In making a determination of essential character, the

court considers "whether the component part (plastic film or aluminum foil) imparts

qualities that are 'indispensable' to the functioning of the subject merchandise."  *Alcan*,

929 F. Supp. 2d at 1348-1349, *aff'd*, Alcan, 771 F.3d 1364 (citing *3G Mermet Fabric*

*Corp.*, 135 F. Supp. 2d at 158-59).  This ability to isolate the contents of the blister

package from its external environment is the precise feature that is sought by customers

when selecting blister package material, Pl. Stmt. Facts ¶ 42; Def. Resp. Pl. Stmt. ¶ 42,

and it therefore distinguishes Formpack as an article.  It is the "qualit[y] that define[s]

[Formpack] as a product."  929 F. Supp. 2d at 1350, *aff'd*, *Alcan*, 771 F.3d 1364.  A

base material comprised only of plastics is unable to attain the same level of barrier as

a base material that contains a layer of aluminum.  Pl. Stmt. Facts ¶ 32; Def. Resp. Pl.

Stmt. ¶ 32.  The record demonstrates the parties' agreement that no commercially

available all-plastic materials provide equivalent barrier characteristics as aluminum.  Pl.

Stmt. Facts ¶ 47; Def. Resp. Pl. Stmt. ¶ 47.  The parties agree that aluminum provides

the impermeable barrier property; in this way, it serves as the "key ingredient[]" to

Formpack.  929 F. Supp. 2d at 1350, aff'd, *Alcan*, 771 F.3d at 1364.  Plastics impart

critical functions to Formpack, but it is the aluminum that "imparts a defining

characteristic that is fundamental to its commercial identity."  *Swimways*, 329 F. Supp.

3d at 1324.

       Finally, the court considers two additional factors that are pertinent to an

essential character analysis:  design and processing.  *See 3G Mermet Fabric Corp.*,

135 F. Supp. 2d. at 151 (in which the court considered the production process of a

composite plastic-fiberglass window/shade fabric in determining its essential character).

A determination of essential character rests on characterizing the merchandise *as a*

*whole*, but in so doing the court may consider how the product is designed as well as

the production process.  *Id.*  In this case, the design and processing of Formpack both

weigh in favor of classifying Formpack as aluminum.  Since the very idea of "backed"

foil implies processing, it would be illogical not to consider how Formpack is

manufactured.  The constituent components of Formpack exist as three separate layers

before any processing occurs.  The foil is then laminated with plastic, and lamination is

typically considered a finishing operation that does not affect classification.  *See*

General Explanatory Notes to Chapter 72; General Explanatory Notes to Chapter 76.[10]

---

[10] Moreover, the cold-forming process by which Plaintiff's customers create blister
cavities in Formpack is a form of processing that is not suited for plastic: blister pack
base materials consisting entirely of plastic cannot be cold-formed to create blister
cavities.  Pl. Stmt. Facts ¶ 35; Def. Resp. Pl. Stmt. ¶ 35.  For the court to determine that

The manufacturing of Formpack, buttressed by the further processing that Formpack

undergoes after importation, suggests that it has the essential character of aluminum.

The essential character of an article is "the component which is indispensable to

the structure, core, or condition of the article, *i.e.* the attribute which strongly marks or

serves to distinguish what it is." *Home Depot USA Inc.*, 427 F. Supp. 2d. at 1284, *aff'd*,

491 F.2d 1334 (Fed. Cir. 2007).  The constituent material that most strongly

distinguishes Formpack is aluminum, so its essential character is aluminum.  While a

plastic-aluminum combination material may conceivably be classified under Heading

3921, Formpack is not correctly classified under this heading because Formpack does

not "retain the essential character of plastics": the multiple, secondary functions

imparted by the plastic do not comport with what is typically associated with the

"essential character" of a good.  Instead, it is the aluminum that creates the barrier

property that distinguishes Formpack.

Having classified the product under the appropriate heading, the court turns to

the subheadings.  *See* GRI 6.  Subheading 7607.20.50 applies expressly to "backed"

foils that do not fit under subheading 7607.20.10, which are those "[c]overed or

decorated with a character, design, fancy effect or pattern."  In this way, the subheading

specifically provides for aluminum foil that has been "backed" with a "backing" material.

Formpack properly belongs under this classification.

---

Formpack is essentially plastic, only then to undergo processing not suited for plastic,
would not make sense.

The court believes that it has reached the legally correct outcome for this case. Nonetheless, the court takes judicial notice that its conclusion could be seen to be at variance with the suggestion of Mr. Maguire as he advised Benjamin Braddock on his future in the 1967 Mike Nichols film, *The Graduate*, based on the 1963 novel of the same name by Charles Webb, and which garnered Nichols the Academy Award for Best Director.[11]  *See Mitsubishi Polyester Film, Inc. v. United States*, 42 CIT ___, ___, 321 F. Supp. 2d 1298, 1300 n. 1 (2018).

"Ben," Mr. Maguire said.

"Mr. Maguire?"  Ben replied.

 "Ben."

 "Mr. Maguire?"

"Come away with me for a minute, I want to talk to you…."  Maguire escorted Ben outside to the pool area.  "I just want to say one word to you.  Just one word."

"Yes, sir?"

"Are you listening?"

"Yes, I am."

"Plastics."

"Exactly how do you mean?"

"There's a great future in plastics.  Think about it.  Will you think about it?"

"Yes, I will."

"Shhh.  Enough said.  That's a deal."

---

[11] THE GRADUATE (Mike Nichols/Lawrence Turman Productions 1967).

## CONCLUSION

Enough said.  For the foregoing reasons, summary judgment is granted in favor of Plaintiff and Defendant's cross-motion is denied.  Customs' classification is reversed and judgment will be entered accordingly.

                                          /s/ Timothy M. Reif
                                        Timothy M. Reif, Judge


Dated: January 3, 2020
         New York, New York